IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FLATIRON-LANE, A JOINT VENTURE,      )
                                      )
            Plaintiff,                )
                                      )
      v.                              )        1:12CV1234
                                      )
CASE ATLANTIC COMPANY and             )
FIDELITY & DEPOSIT COMPANY OF         )
MARYLAND,                             )
                                      )
            Defendants.               )
_____     )
                                      )
CASE ATLANTIC COMPANY,                )
                                      )
            Counter Plaintiff,        )
                                      )
      v.                              )
                                      )
FLATIRON-LANE, a Joint Venture        )
TRAVELERS CASUALTY AND SURETY         )
COMPNY OF AMERICA; FEDERAL            )
INSURANCE COMPANY; FIDELITY           )
AND DEPOSIT COMPANY OF                )
MARYLAND; ZURICH AMERICA             )
INSURANCE COMPANY; LIBERTY            )
MUTUAL INSURANCE COMPANY;             )
FROEHLING AND ROBERTSON, INC.;        )
and STV/RALPH WHITEHEAD              )
ASSOCIATES, INC.,                     )
                                      )
            Counter Defendants.       )
_____     )


MEMORANDUM OPINION AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on Plaintiff Flatiron-Lane, a Joint Venture's ("FLJV's") First Motion for Partial Summary Judgment Regarding Damages [Doc. #68] and FLJV's Second Motion for Partial Summary Judgment Regarding Case's Termination for Convenience Counterclaim [Doc. #71]. For the reasons that follow, both motions should be denied.

I.     Facts, Claims and Procedural History

The instant dispute arises out of the construction of bridges on Interstate 85 ("I-85") over the Yadkin River in Rowan and Davidson Counties, North Carolina. FLJV contracted with the North Carolina Department of Transportation ("NCDOT") to reconstruct and widen a 3.3 mile section of I-85. Relevant to this action, that work included (1) the construction of dual bridges on I-85 over the Yadkin River (collectively referred to as "Bridge 2") and (2) the replacement of Bridge #392 on US 29-70, also over the Yadkin River ("Bridge 3"). FLJV subcontracted with Case Atlantic Company ("Case") to provide all supervision, labor, tools, equipment and materials needed to perform the drilled shaft foundation work for Bridges 2 and 3 (the "Project") for an "Approximate Total" price of $5,468,610.00 (see Subcontract, Attachment C [Doc. #10-1] at 38).

Over the course of the Project, various disputes arose between FLJV and Case regarding performance under the Subcontract and the relative obligations of the Parties. Although the Subcontract contemplated a 16-week schedule for completion of the Project, 43 weeks later, as a result of unforeseen obstacles and numerous delays, Case had only

completed work on Bridge 2. FLJV and Case each attribute the difficulties encountered and related delays to failures of the other Party. According to FLJV, Case failed to provide all equipment, labor and material within the scope of the Project, failed to perform the Project in a timely manner, repudiated its obligations to perform the Project at the agreed-upon prices, failed to follow the approved construction plans for the Project and installed and attempted to be paid for quantities that were neither required by the plans nor authorized for installation. Case, on the other hand, contends that FLJV, among other things, provided inadequate, misleading and incorrect geotechnical information pertinent to the site, unilaterally changed Case's means and methods of construction authorized by the Subcontract without additional compensation or time, failed to recognize the existence of site conditions which differed materially from those indicated in the geotechnical information provided in the Subcontract, and failed to issue change orders.

Because of the experiences encountered in the construction of Bridge 2, Case sought revised pricing for its work on Bridge 3. Ultimately, as a result of disputes over the revised pricing for the work on Bridge 3, FLJV ended its relationship with Case, and FLJV sought an alternate subcontractor for completion of the Project.

In the instant action, FLJV brings claims against Case for breach of contract and bond claims. FLJV also seeks a declaration of "the current rights and outstanding financial obligations between the Parties for all dealings from the beginning of time up until the trial of this matter." (See Compl. [Doc. #5] ¶ 37.) Case filed counterclaims asserting two claims

against FLJV: (1) a claim under the "Termination for Convenience" provision of the Subcontract, based on the termination of the agreement as to Bridge 3; and (2) breach of contract claims based on additional costs incurred by Case as to Bridge 2. Case also asserts claims for negligence against Froehling & Robertson, Inc. ("F&R") and STV/Ralph Whitehead Associates, Inc. ("STV"), two design engineering firms associated with the Project.

FLJV now brings two separate motions for partial summary judgment [Doc. #68, Doc. #71], seeking summary judgment with respect to certain aspects of Case's counterclaims. In the first Motion, FLJV contends that Case cannot recover any damages on its counterclaims because Case cannot prove its damages with a reasonable degree of certainty. In this regard, FLJV specifically contends that Case should not be permitted to use a "modified total cost method" of calculating damages, as discussed more fully below. In the second Motion, FLJV contends that the Court should grant summary judgment in FLJV's favor on Case's counterclaim brought pursuant to the "Termination for Convenience" provision. On this issue, FLJV contends that it did not terminate the Subcontract under the Termination for Convenience provision and that, even if it did terminate the Subcontract under the Termination for Convenience provision, Case has already been compensated for any amounts due under that provision.

II.     Standard

A court must grant summary judgment if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Id. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

III.    Discussion

A.  Motion for Partial Summary Judgment as to Damages

In its first motion for partial summary judgment, FLJV contends that Case cannot recover any damages on its counterclaims because Case cannot prove damages with a reasonable degree of certainty. In support of this contention, FLJV contends that Case is unable to demonstrate the necessary elements required to use the "modified total cost

method" of calculating damages. However, Case has responded by asserting that a substantial portion of its requested damages "can be, and have been, calculated using methods other than the total modified costs measure of damages." (Case Resp. [Doc. #77] at 2.) FLJV does not challenge this assertion. FLJV also has not presented any other basis for requesting summary judgment as to damages computed using other methods. Therefore, it does not appear that summary judgment is appropriate on the issue of damages generally.

To the extent the FLJV seeks to challenge the use of the modified total cost method of calculating damages, it appears that FLJV's request is more in the nature of a motion in limine or jury instruction request, seeking to preclude the jury from considering the modified total cost method in computing damages. In response to FLJV's contentions, Case concedes that a portion of its counterclaims, specifically related to construction of certain 54" drilled shafts, "is solely computed using the modified total cost method." (Case Resp. [Doc. #77] at 2.) However, Case contends that it has presented a sufficient basis for proceeding using this computation method. For the reasons discussed below, the Court concludes that any further determination regarding whether and how this issue is presented to the jury is more appropriately resolved as part of the trial in this case.

The North Carolina Court of Appeals has recognized the potential use of the modified total cost method in computing damages in construction cases. Biemann & Rowell Co. v. Donohoe Cos., Inc., 147 N.C. App. 239, 245, 556 S.E.2d 1, 6 (2001). Under the total cost method, "a contractor seeks the difference between its total costs incurred in

performance and its bid price." Id. (citing Youngdale & Sons Constr. Co., Inc. v. United States, 27 Fed. Cl. 516, 541 (1993)). "This method is condoned only where no other way to compute damages is feasible, 'because it blandly [sic] *assumes* – that every penney [sic] of the plaintiff's costs are *prima facie* reasonable, that the bid was accurately and reasonably computed, and that the plaintiff is not responsible for any increases in the cost." Id. (quoting Youngdale, 27 Fed. Cl. at 541). A party seeking to employ this method must be able to demonstrate: "(i) the impracticability of proving actual losses directly; (ii) the reasonableness of its bid; (iii) the reasonableness of its actual costs; and (iv) the lack of responsibility for the added costs." Biemann & Rowell, 147 N.C. App. at 245, 556 S.E.2d at 5. "The *modified* total cost method is the total cost method with adjustments for any deficiencies in plaintiff's proof in satisfying the four requirements." Id. "The modified approach assumes the elements of a total cost claim have been established, but permits the court to modify the test so that the amount plaintiff would have received under the total cost method is only the starting point from which the court will adjust the amount downward to reflect the plaintiff's inability to satisfy the test." Id. In Biemann, the issue was presented as part of a bench trial, and the trial court concluded as part of its findings and conclusions that the plaintiff had failed to establish, by a preponderance of the evidence, the impracticability of proving actual losses directly. Id. In the present case, FLJV contends that Case cannot prove any of the four requirements.

i. Impracticability of proving actual losses

FLJV first contends that Case cannot show "the impracticability of proving actual losses directly." In this regard, FLJV highlights the following exchange in the deposition testimony of Case's expert, Mr. Lugo:

> Q. As I understand your report and your testimony, you're saying that it's impossible for you or Case to isolate the costs of what Case contend are changes in the scope of its work?
> . . . .
> A. Okay. It is our opinion that the records are not detailed enough to isolate Case's costs.
> Q. So you can't do an actual damages analysis; is that correct?
> A. In our opinion, that is correct.
> Q. And in your opinion, could Case have maintained records sufficient to perform an actual damages analysis?
> Mr. Carey: Object to form.
> A. Case could have. FLJV could have. The downside is, it's a great expense or can be a great expense.

(Lugo Dep. [Doc. #69-11] at 172.)

Given Mr. Lugo's apparent admission that Case "could have" maintained records sufficient to enable an actual damages analysis, FLJV likens this case to Cavalier Clothes, Inc. v. United States, 51 Fed. Cl. 399, 419 (2001), and Propellex Corp. v. Brownlee, 342 F.3d 1335 (Fed. Cir. 2003). In Cavalier, the court rejected the plaintiff's use of the total cost method where the plaintiff was unable to prove its actual losses, "not because of the fleeting or ephemeral nature of those losses, or any theoretical inability to capture or document their magnitude, but simply because plaintiff failed to maintain its records." Cavalier, 51 Fed. Cl. at 419. The Cavalier court noted its disinclination "to allow a plaintiff to rely on [the total

cost] method based on a bed of its own making" and further stated that it "and its predecessor have refused to apply either the 'total cost' or 'modified total cost' methods where a contractor failed to exercise diligence in preserving its records." Id. In Propellex, the court found that the "the hours and costs attributable to the [] investigation were commingled with all labor hours and costs of contract performance, so that [the plaintiff] could not prove its costs directly." Propellex, 342 F.3d at 1336-37. The court concluded that:

> Where it is impractical for a contractor to prove its actual costs because it failed to keep accurate records, when such records could have been kept, and where the contractor does not provide a legitimate reason for its failure to keep the records, the total cost method of recovery is not available to the contractor.

Id. at 1342.

In its Response to FLJV's argument, Case first contends that the nature of the changes required to its shaft work due to FLJV's alleged contractual breaches reveals the necessity of the use of the modified total cost method for calculating damages. Specifically, Case argues that during the bidding and contracting process with FLJV, Case contemplated, and FLJV approved, a method by which Case would employ temporary outer casings in its shaft work. According to Case, "[o]n its face, the Plan clearly contemplated the use of 60" to 72" diameter outer temporary casing, and 54" to 60" inner permanent casing." (Case Resp. [Doc. #77] at 4.) Case's position in this case is that FLJV subsequently foreclosed Case from using its intended method, leading to greater expense and numerous delays.

According to Case, that change, in combination with other unexpected impediments, makes it impossible to accurately sort out costs. (Case Resp. [Doc. #77] at 9.) Thus, Case argues that, due to the intertwined nature of the costs involved, "to determine Case's actual damages, it would be necessary to make an assumption as to what the cost would have been to perform Case's contract work, which is essentially what the modified total cost method does." (Id. at 14.)

Case also offers the Declaration of Mr. Lugo, created after the above-cited deposition testimony, in which Mr. Lugo states, in relevant part, as follows:

> I have reviewed FLJV's brief in support of its motion for summary judgment, in which FLJV relies upon an excerpt from my deposition, in arguing that Case "could have" kept records detailed enough to perform an actual damages analysis. Even if Case kept more detailed records of its actual costs on a shaft-by-shaft basis, the loss of productivity impact costs would still be inextricably intertwined with Case's contract work. There is no practical way to segregate the total impact costs from the costs Case would otherwise have incurred in performing its contract work; and likewise there is no practical way to segregate the total costs attributable to the various impacts. Therefore, to determine Case's actual damages, it would be necessary to make an assumption as to what the costs would have been to perform Case's contract work. Accordingly, I determined that the modified total cost method was both appropriate and necessary to use in measuring Case's damages incurred due to impacts during the constructions of the 54" drilled shafts.

(Lugo Decl. [Doc. #78-18] ¶ 7.)

FLJV urges the Court to reject Mr. Lugo's declaration because of its apparent tension with his earlier deposition testimony. (See FLJV Reply [Doc. #79] at 7.) "A party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that

flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999). However, it is not clear that Mr. Lugo's deposition testimony, even taken at its face, should foreclose Case's argument of impracticability. As outlined above, when asked whether Case could have "maintained records sufficient to perform an actual damages analysis," Mr. Lugo responded: "Case could have. FLJV could have. The downside is, it's a great expense or can be a great expense." (Lugo Dep. [Doc. 69-11] at 172.) Mr. Lugo offers no additional elaboration of the referenced "great expense" during his deposition, and that line of questioning is not pursued further. (See id.) To the extent a "great expense" is a reflection that accurate record keeping would be exceedingly difficult and therefore cost prohibitive due to the nature of the damages, such a contention would seemingly not be inconsistent with an argument of impracticability as it is contemplated under the foregoing standard. At the very least, such testimony does not suggest that Case's failure to maintain records here is akin to the failures in the cases cited by FLJV, in which the plaintiffs' own carelessness, or simple failure to exercise diligence, foreclosed use of the total cost method. See, e.g., Cavalier, 51 Fed. Cl. at 419 (finding plaintiff "abandoned and ultimately discarded" its repair records); Propellex, 342 F.3d at 1336-37 (finding Propellex "commingled with all labor hours and costs of contract performance, so that Propellex could not prove its costs directly").

Furthermore, '[t]he application of this 'sham affidavit' rule 'must be carefully limited to situations involving flat contradictions of material fact.'" Kawa v. Duke Univ. Health Servs., No. 1:12CV184, 2013 WL 2156027, at *5 (M.D.N.C. May 17, 2013) (quoting Mandengue v. ADT Sec. Sys., Inc., No. ELH-09-3103, 2012 WL 892621, at *18 (D. Md. Mar. 4, 2012)). "As quoted by the court in Mandengue, 'The inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.'" Id. Here, at least, Mr. Lugo has offered some explanation of his prior deposition testimony. Given the relatively brief attention this issue was given during the course of Mr. Lugo's deposition, and in light of the more fulsome response offered in his declaration, the Court should refrain from deeming Mr. Lugo's subsequent affidavit a sham so as to foreclose its consideration, and should leave resolution of this matter for further consideration based on the evidence ultimately presented at trial with respect to whether it is or was impracticable for Case to show actual damages or to maintain records sufficient to enable that calculation.

ii. Reasonableness of Case's Bid

FLJV next contends that Case cannot show that its bid was reasonable. As FLJV notes, "a determination of what was a reasonable bid must be made from the bids of others." Servidone Const. Corp. v. U.S., 19 Cl. Ct. 346, 384-85 (1990). Other facts relevant to the reasonableness of the bid include:

> [T]he depth and accuracy of information available to and relied upon by the
> bid preparer, the bid preparer's investigation or knowledge of the contract

conditions, . . . the contractor's experience with the type of project contemplated, . . . the contractor's anticipation of adjustment to the contract provisions, and the governmental expectation of contract bids.

Cavalier, 51 Fed. Cl. at 422.

FLJV points primarily to Youngdale & Sons Const. Co., Inc. v. U.S., 27 Fed. Cl. 516 (1993), in support of its argument that Case's failure to prove the reasonableness of its bid warrants granting summary judgment in its favor. (See FLJV's Br. [Doc. #70] at 15.) FLJV argues that here, Case's bid was almost 20% lower than the average of its competitors' bids, whereas, in Youngdale, the court found a bid that was 17% lower than the average of its competitors to be unreasonable. However, in Youngdale, the Court had before it twelve bids with which to perform a comparison. Here, in contrast, only three bids, including Case's, are available. Moreover, all of the bids in this action – the first of $8,087,528.78, the second of $7,285,246.00, and Case's of $6,174,459.60 – are separated by a substantial dollar amount. The Court cannot say that Case's bid was unreasonable as a matter of law because it was 19.7% lower than the average of its two competitors when the two competitors' bids are themselves separated by over $800,000.00.[1] In fact, the substantial discrepancies can also support the conclusion that it is not unusual that bids for work of this nature to vary greatly in the normal course.

---

[1] Applying the logic FLJV urges, the higher bid could be deemed unreasonable because it exceeds the average of the lower two bids by over 20%.

Regardless, even if the Court were to employ the reasoning from Youngdale, summary judgment would not be warranted. The plaintiff in Youngdale sought to use the total cost method rather than the modified total cost method of proving damages. The Youngdale court determined that despite the plaintiff's failure to prove the reasonableness of its bid, the court would use the average of the other available bids to determine a reasonable bid estimate and would allow the plaintiff to pursue the modified total cost method under that calculation. Accordingly, even if this Court were to follow the Youngdale court as FLJV urges, any failure of Case to prove the reasonableness of its bid at this stage would not necessarily be fatal to its pursuit of its damages, but would merely provide an instance in which the Court might adjust Case's bid to account for that failure. See Youngdale, 27 Fed. Cl. at 543 ("[B]ecause the court has modified plaintiff's bid so as to satisfy element 2 of the total cost method, the court hereby finds that the plaintiff has failed to prove its damages claim under the total cost method by a preponderance of the evidence, and is hereby relegated, if appropriate, to use of the modified total cost method as proof of its damages."). Such a practice, in fact, would be in line with the purpose of employing the modified total cost method and is, accordingly, not a ground for granting summary judgment.

Furthermore, the other factors stressed by FLJV as suggesting that Case's bid was unreasonable merely present additional factual questions. FLJV notes that Case's primary bid estimator, Mr. Buck, "stated that, compared to what he would prefer, the subsurface boring information provided for bidding purposes were inadequate for [Case] to determine

the rock quantities it would encounter." (FLJV Br. [Doc. #70] at 14-15 (citing Ex. 175 [Doc. #69-9] at 23-25).) However, Case has provided evidence that FLJV provided what Case contends was the inadequate subsurface boring information Case used to develop its bid. Whether that boring information was inadequate as Case contends, and whether Case was justified in relying on the same, cannot be resolved at this stage. FLJV also highlights that Mr. Buck priced and bid the Project without visiting the site despite having what he characterized as very little information. (Id. (citing Ex. 175 [Doc. #69-9] at 18).) But Mr. Buck testified that bidding absent a visit to the site is not unusual because "there's not a lot you can do at that point because there's been no work done on the job yet. It's just a river out there in the woods." (Ex. 175 at 19, 93-94.) In these circumstances, the Court cannot say that no genuine issue of material fact remains regarding the reasonableness of Case's bid.

### iii. Reasonableness of Actual Costs

FLJV next contends that Case cannot show that its actual costs were reasonable. Case must be able to "prov[e] that the actual costs were reasonable in light of the . . . changes about which plaintiff complains." Cavalier, 51 Fed. Cl. at 423. FLJV's argument on this point in its supporting brief is as follows:

> The declarations of FLJV's employees that were directly in charge of monitoring Case's work on the Project have testified that Case made no secret about the fact that it was, effectively, running up its costs because Case's superintendent thought Case would be able to pass off its costs overruns onto FLJV though [sic] this lawsuit.

(FLJV Br. [Doc. #70] at 17 (citing Doc. #69-16 and Doc. #69-17).) FLJV does not expound on this argument further in its Reply. (See FLJV Reply [Doc. #79].) However, the cited affidavits reflect the ongoing disagreement between Case and FLJV regarding the construction of the shafts and FLJV's changes in design. Simply put, the opinion of FLJV's employees that Case was attempting to "run up" its costs by refusing to change the construction of the shafts is insufficient to warrant the conclusion that no issue of genuine fact exists as to the reasonableness of Case's actual costs.

### iv.   Lack of Responsibility for Added Costs

Lastly, FLJV contends that "Case's failure to keep records of its costs during segments of the Project is fatal to its ability to attribute responsibility for added costs." (FLJV's Br. [Doc. #70] at 19.) FLJV argues that "Case uses the same method as that [rejected] in Biemann [and Rowell Co. v. The Donohoe Cos., Inc., No. 99-CVS-9132, 2000 WL 33954580, 2000 NCBC 8, at *12 (June 5, 2000), aff'd Biemann and Rowell Co. v. Donohoe Cos., Inc., 147 N.C. App. 239 (2001)], which is to allocate 'only a narrow set of costs to itself, and then [attribute] the remainder of the cost overrun entirely to' FLJV." (Id. at 19-20.)

FLJV's argument regarding Case's ability to keep accurate records to some extent overlaps with its argument regarding Case's failure to show the impracticability of performing an actual damages analysis, and, for the same reasons, is inappropriate for resolution at summary judgment. In addition, Case asserts that it "maintained all of the job

costs records on the Project, [Mr.] Lugo has thoroughly reviewed same; and [Mr.] Lugo has deducted out those costs that were Case's responsibility" (Case Resp. [Doc. #77] at 20), and cites to Mr. Lugo's deposition in which he avers the same. Furthermore, Case's ability to "isolate the nature and extent of specific delays and connect them to an act or omission by defendant," Biemann and Rowell, 147 N.C. App. at 245, goes to the core of this lawsuit. A finding on summary judgment as to this issue would be premature. In fact, the Biemann & Rowell court, on which FLJV relies, made its determination only after trial.

In sum, genuine issues of material fact remain regarding the propriety of Case's use of the modified total cost method that are inappropriate for resolution at summary judgment and are more appropriately resolved based on a consideration of the evidence presented at trial, with a determination at that time of whether and how certain issues should be submitted to the jury.[2] Therefore, FLJV's First Motion for Summary Judgment regarding Case's damages should be denied, and all issues regarding the use of the modified total cost method for computing damages should remain for consideration as part of the trial in this case.

---

[2] The Sixth Circuit recently endorsed this approach, finding that the district court did not abuse its discretion in allowing a damages expert to testify using the "total cost" method, since "the weighing of credibility is a task rightly left to the jury" and it was up to the jury to "determine if [the plaintiff sub-contractor] had established the elements of the 'total cost' method by a preponderance of the evidence, as was dictated by the jury instructions." J-Way Leasing, Ltd. v. American Bridge Co., 500 F. App'x 365 (6th Cir. 2012). Of course, the question whether and how to submit this issue to the jury in the present case remains for further consideration at trial based on the evidence ultimately presented, as noted above.

B.     Termination for Convenience

In its second motion for partial summary judgment, FLJV contends that it is entitled

to judgment as a matter of law on Case's first counterclaim, entitled "Termination for

Convenience Against FLJV."  (Counterclaim [Doc. #10] at 12.)  Specifically, FLJV contends

that it is entitled to judgment as a matter of law on this counterclaim because (1) FLJV did

not terminate the contract for convenience and instead exercised its right under a separate

provision which allowed it to change the scope of work to remove Bridge 3; and (2) even if

the Termination for Convenience provision does apply, "Case has already been fully

compensated for the amount it would have been due" (Pl.'s Second Motion [Doc. #71] at 2).

In considering these contentions, the Court notes that the Termination for

Convenience provision of the Subcontract states:

> 21.1 [FLJV], upon two (2) days written notice, may terminate this Subcontract,
> in whole or in part, if [FLJV] considers termination to be in its best interest.
>
> 21.2 [Case] shall be compensated for costs of all Work it has performed,
> including a reasonable profit thereon, in accordance with the terms and
> conditions for termination for convenience in the Contract.   Under no
> circumstances is [Case] entitled to anticipatory, unearned profits or
> consequential or other damages as a result of a termination or partial
> termination for convenience.  Payment to [Case] as determined in accordance
> with the provisions of the Contract, shall constitute [Case's] exclusive remedy
> for termination under this Article.

(Subcontract, Attachment B [Doc. #10-1] at 28.)  Case contends that FLJV's decision to end

its relationship with Case prior to Case performing its work on Bridge 3 amounts to a

termination under this Termination for Convenience provision.   In Case's view, this

provision entitles it to compensation for costs of all work already performed, including a reasonable profit thereon, without regard to the agreed-to contractual amounts that would have been owed had the Subcontract been performed without issue. (See Case Resp. [Doc. #75] at 11-12.)

In its Motion for Summary Judgment, FLJV first contends that it acted, instead, within Article 3 of the Subcontract, entitled "Changes," which provides in relevant part as follows:

> 3.1 [FLJV] may at any time by written order of [FLJV's] authorized representative, and without notice to Subcontractor's sureties, make changes in, additions to and deletions from the Work, and Subcontractor shall promptly proceed with the Work so changed. The Subcontract Price shall be equitably adjusted on account of any changes in the Work, subject to any applicable provision of the Contract.

(Subcontract, Attachment B [Doc. #10-1] at 18.) In support for its position that it acted under Article 3, FLJV points to a letter that FLJV sent to Case regarding the termination of their relationship. FLJV notes that, in that letter, it references only the Subcontract's provisions for a change in scope of work without "mention whatsoever of a termination for convenience." (FLJV Br. [Doc. #72] at 11.) FLJV further notes that the Termination for Convenience provision requires two days written notice and argues that the only letter that can be construed as satisfying that written notice requirement likewise only contemplates deleting Bridge 3 from Case's scope of work under Article 3 without mention of termination for convenience. (Id. at 12.)

Having considered FLJV's contentions in this regard, the Court cannot conclude that FLJV's unilateral labeling of its decision as a "change" under Article 3 necessarily controls the contract interpretation as a matter of law. Instead, it appears that it is also reasonable to interpret Article 3 to encompass only situations in which work remains for the subcontractor (that is, where the subcontractor can "promptly proceed with the Work so changed"), but not situations where, as here, the relationship ceases completely and the contractor seeks an alternate subcontractor to complete the project. Indeed, FLJV's interpretation would seemingly render the Termination for Convenience provision superfluous to the provisions of Article 3, and "an interpretation which gives a reasonable meaning to all provisions of a contract will be preferred to one which leaves a portion of the writing useless or superfluous," Southern Seeding Serv., Inc. v. W.C. English, Inc., 217 N.C. App. 300, 305, 719 S.E.2d 211, 215 (2011). In any event, because the "agreement is ambiguous and the intention of the parties is unclear," the question of whether FLJV had the ability to end its relationship with Case under the provisions of Article 3 remains one for the finder of fact. See Commscope Credit Union v. Butler & Burke, LLP, 764 S.E.2d 642, 651 (N.C. App. 2014).

With respect to FLJV's alternative contention that, "Case has already been fully compensated for the amount it would have been due" even if the Termination for Convenience provision applies, the Court notes that Case contends that it has not received

the full amount due, even under the "unit price" calculation advanced by FLJV. Thus, given the issues remaining, summary judgment is not appropriate as to this counterclaim.

Moreover, the Court also notes that the parties have pointed to an additional dispute regarding the proper interpretation of the Termination for Convenience provision, specifically with respect to the payment owed to Case in the event of a termination for convenience. As noted above, Case contends that this provision entitles it to compensation on a "cost plus profit" basis, without regard to the "unit price" amounts that would have been owed had the Subcontract been performed without issue. In contrast, FLJV argues that the language of the Subcontract limits Case to the "contract unit or lump sum prices" in the event of a termination for convenience. The Termination for Convenience provision provides the following language regarding payment: "Subcontractor [Case] shall be compensated for costs of all Work it has performed, including a reasonable profit thereon, *in accordance with the terms and conditions for termination for convenience in the Contract*." (Subcontract, Attachment B [Doc. #10-1] at 28 (emphasis added).) The Subcontract, in turn, defines the "Contract" as the "Contract between Owner [NCDOT] and Contractor [FLJV]." (Id. at 3.) FLJV thus contends that, because the Contract incorporates by reference the NCDOT Standard Specifications for Roads and Structures ("SSRS"), proper interpretation of the payment owed in the event of termination for convenience requires looking to the SSRS. FLJV then quotes the following portion of Section 108-13(E) of the SSRS:

(E)     After a contract is terminated in accordance with this termination provision, the following provisions shall be applicable:

21

(1)     When the contract is terminated before completion of all items of work in the contract, *payment will be made for the actual number of acceptably completed items of work or acceptably completed portions thereof at the contract unit or lump sum prices.* When the contract is terminated before the completion of all items of work in the contract and items of work are partially completed or not begun, payment will be made in accordance with Article 104-6.

. . . .

(4)     *No claim for loss of anticipated profits will be considered and no payment will be made for loss of anticipated profits.*

(NCDOT SSRS § 108-13(E) (July 1, 2006) [Doc. #69-6] (emphasis by FLJV)).

However, Section 108-13(E) itself appears to be applicable only in certain specifically proscribed circumstances set out in other subsections, and it is not clear on its face that the Subcontract necessarily incorporates this provision of the SSRS. The Parties point to no other provision of the Contract or of the SSRS that appears to elaborate on payment in the event of a termination for convenience. Thus, the Subcontract is ambiguous in this regard. Moreover, even if the Court accepts FLJV's contention that Section 108-13 of the SSRS is incorporated by reference, the Subcontract is still ambiguous to the extent that the Termination for Convenience provision of the Subcontract provides for compensation for costs of work performed, including a reasonable profit, but then provides that compensation is in accordance with the Contract, which incorporates the "contract unit" measure of compensation. Thus, there appears to be inconsistency, or at least a lack of clarity, in interpreting this provision on its face. For all of these reasons, it appears that the Subcontract is ambiguous with respect to the compensation owed to Case should FLJV be

determined to have acted under the Termination for Convenience provision. Given this ambiguity, this dispute is one for the finder of fact, and is not properly before the Court for resolution as a matter of law.[3]

IV.     Conclusion

Genuine issues of material fact remain both as to the propriety of Case's use of the modified total cost method of calculating damages and the proper classification and ramifications of FLJV's termination of its contractual relationship with Case.

IT IS THEREFORE RECOMMENDED that FLJV's First Motion for Partial Summary Judgment Regarding Damages [Doc. #68] and FLJV's Second Motion for Partial Summary Judgment Regarding Case's Termination for Convenience Counterclaim [Doc. #71] be DENIED.

This, the 24th day of February, 2015.

                                                        /s/ Joi Elizabeth Peake
                                                  United States Magistrate Judge

---

[3] The Court does note that a reasonable interpretation of the Subcontract as a whole would appear to allow consideration of Case's claims related to Bridge 2, as set out in the counterclaim for breach of contract, without any further adjustment based on the termination as to Bridge 3. Under this interpretation, the termination as to Bridge 3 would not provide for greater recovery (on a cost plus profit basis) as to Bridge 2, since this would result in an unintended windfall and incentive to provoke termination. However, the termination as to Bridge 3 also would not impose the original "unit price" limit without regard to the additional claims asserted by Case as to Bridge 2. In any event, however, the interpretation of the contract is a matter for the finder of fact, and is not properly resolved by the Court on the pending Motions for Summary Judgment.